James L. SNYDER, petitioner,
Respondent,

v.

CITY OF MINNEAPOLIS,
petitioner, Appellant.

No. C7–87–1394.

Supreme Court of Minnesota.

June 9, 1989.

Rehearing Denied July 13, 1989.

Clay R. Moore, Mackall, Crounse & Moore, Minneapolis, for petitioner, appellant.

Robert J. Alfton, Jerome F. Fitzgerald, Office of City Atty., Minneapolis, for petitioner, respondent.

League of Minnesota Cities, Thomas J. Crundhoefer, Ass'n of Minnesota Counties, Margaret J. Flicker, St. Paul, for amicus curiae.

WAHL, Justice.

This case arose out of a land use dispute between plaintiff, James Snyder, and the City of Minneapolis. Snyder brought suit

against the city on April 10, 1986 in Hennepin County District Court for damages caused when the city issued him a building permit to build a new building and a permit to demolish his existing building then revoked the building permit after the existing building was demolished. Snyder alleged negligence, estoppel and a deprivation of his constitutional rights in violation of 42 U.S.C. § 1983. He also sought an injunction to compel the City to grant him a variance.[1] Rejecting the City's defense of discretionary immunity, the trial court entered judgment for Snyder on the negligence and estoppel claims, but found no basis for the § 1983 claim. Both parties appealed. The court of appeals agreed that the city was not immune from liability for its negligent issuance of the building permit, held the award of damages for negligence not to be clearly erroneous but imposed a $200,000 cap on the city's liability under Minn.Stat. § 466.04 (1986) and affirmed denial of the § 1983 claim. *Snyder v. City of Minneapolis*, 422 N.W.2d 747 (Minn.App.1988). We affirm in part, modify in part, and remand.

## I

James Snyder has owned property at 1409 West Lake Street in Minneapolis since 1977. Until the summer of 1985 the lot was occupied by a two story brick building, with a basement. The building measured 30′ by 46′, including a four foot exterior deck and stairway. The building was located adjacent to Calhoun Square and within 300 feet of the Calhoun Square Parking Ramp. In 1983 an adjacent alley was abandoned, adding 6 feet to Snyder's lot which then measured 36′ by 46′.

Snyder's lot was located in the B3S–3 Zoning District which, under Minneapolis Zoning Code § 540.1460, required that structures provide a minimum of four off-street parking places. Snyder's building did not have to meet the offstreet parking requirement because it was grandfathered in as a pre-existing structure. In February of 1985 the building, then worth $155,000, suffered fire damage. The cost of repair was placed at $45,000. Instead of repairing the existing building, Snyder decided to build a new building, which he believed could be built to full dimensions of the now larger lot.

In June of 1985 through his contractor, Willard Weikle, plaintiff submitted a proposal for a new 36′ × 46′ building to the Zoning Office. Edward Virnig, a Zoning Office employee, told Weikle the proposal did not show the four off-street parking places which were required. Virnig also told Weikle to contact the city coordinator's office regarding the possible use of parking spaces in the recently opened Calhoun Square Parking Ramp (ramp) to satisfy the parking requirement. Virnig said spaces in the ramp might satisfy the parking requirement because the ramp was financed in part by an Urban Development Action Grant (UDAG).

Weikle contacted the city coordinator's office, which forwarded to Virnig a copy of § 4.3 of the UDAG agreement which provided,

> [D]eveloper shall maintain equal access to at least 140 parking spaces of the 450 total spaces in the ramp for the general public use by the merchants and customers of the immediate and existing Hennepin–Lake (non-shopping mall center clientele) retail area.

There is no indication in the record that any doubts were ever expressed to Weikle or Snyder at any time prior to the granting of the building permit by any city employee questioning the use of the publicly dedicated parking spaces in the ramp to satisfy the zoning requirement.

In June of 1985 Virnig gave unrestricted zoning approval to Snyder's proposal by putting the zoning stamp on the plan. Virnig gave this approval based upon parking spaces in the ramp satisfying the zoning requirements. According to William Nordrum, the city's zoning supervisor, Virnig only assumed parking in the ramp could be

1. The injunction issue became moot and was not considered by the trial court when plaintiff

started construction in January of 1987.

used to satisfy the zoning requirements. Nordrum also said several property owners in the area had previously been told they could not use parking in the ramp to satisfy zoning requirements.

Snyder obtained a wrecking permit dated July 31, 1985. On August 8, 1985, Weikle picked up and paid $958.58 for a building permit for Snyder's proposed 36' × 46' structure. On that date Snyder commenced demolition of the existing structure. The trial court found Snyder commenced demolition of the existing building in reasonable reliance on the issued building permit. The demolition was completed August 14, 1985, and construction of the new building began.

On August 8, 1985, Ray Harris, the developer of Calhoun Square, called Nordrum and, after inquiry as to what was being done on Snyder's property, claimed Snyder was not entitled to use the ramp to satisfy his parking requirements. Nordrum was aware that Snyder and Harris had long been at odds. In mid-August, Donald Olson, deputy director of the Department of Inspections, called Weikle, telling him the building permit was revoked and to stop work. Footings for the new building had already been poured. The revocation was prompted by advice to Olson, from Nordrum, who accepted Ray Harris' claim regarding parking in the ramp.

Shortly thereafter Olson sent a letter to Weikle confirming the revocation. Although the letter was dated August 20, 1985, it was apparently written on August 8, 1985, the same date the building permit was issued, because that date was crossed out on the City's file copy and August 20, 1985, was written in its place. The letter received by Weikle had been erased with liquid paper and redated. The trial court said it appeared the decision to revoke the permit was made on or before August 8, 1985. The trial court found the City had "knowledge" of the demolition of Snyder's existing building because the City had been involved in scheduling the demolition and had approved a demolition date of August 8, 1985. The trial court found that the existing building could have been saved

because of this knowledge yet the City had not promptly notified Snyder that his building permit was in the process of being revoked.

The City did not give Snyder notice or an opportunity to be heard before revoking his building permit, nor does the City have any procedures for doing so. Had Snyder been given a hearing, he could have shown that neither he nor Weikle supplied erroneous information as the revocation letter from Olson alleged. Snyder was told by City Council member Joan Niemiec the City Council would consider his plight but he was told he could not attend that meeting. Snyder was told the building permit had been a mistake and he was invited to apply for a variance for the original 36' × 46' building.

Nevertheless, when Snyder applied for such a variance the Board of Adjustment (Board) denied it on October 23, 1985. The City Council denied the same variance on November 15, 1985. Robert Fine, a business associate of Ray Harris, sat in on the Board's meeting as a "volunteer" sixth member, to the five person board. Fine made a motion in opposition to Snyder's variance application.

Joan Niemiec told Snyder on several occasions that she would support putting him back in the position he was in before demolition. The Board granted a variance for a 30' × 42' building on November 27, 1985. The trial court found that such a building would be smaller than his old building because construction of an exterior staircase, as was on the old building, would require a variance. No finding was made whether Snyder actually applied for such a variance. The purported reason for denying Snyder's variance for a 36' × 46' structure was his failure to meet the offstreet parking requirements. The trial court found this reason not based in fact because the offstreet parking requirements for a 36' × 46' structure are the same as those for a 30' × 42' structure, for which a variance had been granted. The Board did grant a variance for a 36' × 46' structure on January 29, 1986, conditioned on Snyder leasing park-

ing from McDonalds. Snyder was unable to secure the lease.

Snyder made further variance applications as follows:

a. variance of off-street parking requirement for 36' × 46' foot building with partial second floor;

denied by Board of Adjustment on November 27, 1985; denied by Zoning and Planning Committee on November 5, 1985; denied by City Council on November 15, 1985;

b. variance of off-street parking requirement for a 36 × 46 foot one story building (1,656 square feet);

denied by Board of Adjustment on February 26, 1986; denied by City Council on March 28, 1986;

c. variance of off-street parking for 30 × 46 foot two story building;

denied by Board of Adjustment on March 26, 1986; denied by Zoning and Planning Committee on April 15, 1986.

d. variance of off-street parking from 4 to 0 to permit a 30 × 42 foot two story building

put on hold by the Board of Adjustment on March 31, 1986;

e. variance of off-street parking from 4 to 0 to permit a 30.5 × 42 foot building;

granted by Board of Adjustment on December 23, 1986.

Due to economic hardship, Snyder commenced construction of a new 30' × 42' building in January 1987. In February of 1987 Snyder applied for a parking variance to permit him to lease the new premises to a restaurant. The Board denied this variance and the Zoning and Planning Commission put the appeal of the denial on hold pending outcome of this suit.

The court found the City acted negligently in its treatment of Snyder's building permit application and that the permit was wrongfully issued. Virnig was also negligent in not seeking supervision; Nordrum was negligent in failing to provide it. Virnig's acts were found to be ministerial, not discretionary, so the discretionary immunity provision of Minn.Stat. § 466.03 (1986) was not applied. The court found the law concerning the use of the publicly dedicated parking spaces in the ramp to be unclear and the City's policy against such use to be unwritten. The trial court found Snyder acted in reasonable reliance, to his detriment, on the wrongfully issued building permit. The City was estopped from denying Snyder's damages. Snyder's § 1983 action was summarily denied. The trial court awarded damages of $795,389.67 but ordered the damages to be reduced if the City granted Snyder's request for a restaurant license, which the City then did.[2] Judgment was entered for Snyder in the amount of $396,026.75.

The court of appeals affirmed, holding that a city zoning clerk's issuance of a building permit was not a discretionary act where the clerk had no authority to make planning or policy decisions, to change the requirements of the zoning code or to grant variances. The city was thus held not immune from liability in this case. The court of appeals also held the trial court's determination of damages was not clearly erroneous but reduced the total award to $200,000, pursuant to Minn.Stat. § 466.04 (1988). The court of appeals determined the statutory damages cap not to be an affirmative defense and therefore not waived by the city's failure to affirmatively plead the cap in the trial court. The court of appeals declined to address the constitutionality of Minn.Stat. § 466.04, because the issue had not been addressed by the trial court, but summarily affirmed the trial court's dismissal of plaintiff's § 1983 claim. We granted review.

The City argues on appeal it is immune from liability under the circumstances of this case, and the award of damages is erroneous. Snyder argues the City is liable under 42 U.S.C. § 1983 because it denied his due process rights; the damages limitation of Minn.Stat. § 466.04 is an affirmative defense which the City waived by not pleading; the damage cap on tort judg-

---

2. The trial court's allocation of damages is set forth in Appendix A. The first floor of the build-

ing was subsequently leased to Johnny Rockets Restaurant.

ments against municipalities is unconstitutional; and full recovery should have been allowed on the theory of estoppel.

## II

This case was pled and tried as an action in tort. Amicus curiae State of Minnesota strongly urges that Snyder's remedy lies, not in tort for damages, but in an action for inverse condemnation because Snyder's claim is, in substance, a claim of an unconstitutional compensable taking. This court and other courts, as the state correctly notes, have rejected efforts to treat zoning cases as tort actions, analyzing them instead under the theory of inverse condemnation. *See Alevizos v. Metropolitan Airports Comm'n.*, 298 Minn. 471, 403 n. 1, 216 N.W.2d 651, 660 n. 1 (1974).

In the present case, however, the state misperceives the nature of the negligence claim for which the trial court awarded damages. The trial court found the initial building permit wrongfully issued and that plaintiff was justified in relying on the permit when he demolished his existing building. The trial court's findings and award do not suggest the City through either overt physical activity or through excessively burdensome regulation prevented the beneficial use of plaintiff's property, a necesary predicate to establish an uncompensated taking. *See McShane v. City of Faribault*, 292 N.W.2d 253, 257–258 (Minn.1980). Our reading of the trial court's finding leads us to the conclusion that damages were not awarded in this case because the Minneapolis Zoning Code off-street parking requirement denied the plaintiff, temporarily, all beneficial use of his property. *See First English Evangelical Lutheran Church v. Los Angeles City*, 482 U.S. 304, 316–20, 107 S.Ct. 2378, 2386–88, 96 L.Ed.2d 250 (1987). Plaintiff was never denied the right to repair and continue the use of his existing building.

Rather, damages were awarded because the plaintiff demolished his existing structure in reliance on the issued building permit and thereby suffered damages. That reliance was justified in the particular circumstances of this case.

The City does not challenge the trial court's finding of negligence but insists it cannot be found liable because the negligent acts in question are discretionary in nature. Whether the acts of the City's employees are a discretionary function is a legal question, thus, on review, we give no deference to conclusions of the courts below. *See A.J. Chromy Const. Co. v. Commercial Mechanical Services, Inc.*, 260 N.W.2d 579, 582 (Minn.1977).

Municipalites, while generally liable in tort under Minn.Stat. § 466.02 (1988) are immune from tort liability for their discretionary acts under Minn.Stat. § 466.03, subd. 6 (1988).[3] In *Anderson v. City of Minneapolis*, 287 Minn. 287, 178 N.W.2d 215 (1970), we considered a question similar to the one presented here. In *Anderson* a building permit was issued and two weeks later was revoked. The trial court awarded damages. This court reversed, stating the acts of city employees, in issuing the permit, involved an exercise of discretion. *Id.* at 288, 178 N.W.2d at 217. We also said if the proposed land use authorized in the issued building permit was clearly illegal, such that no element of discretion was involved, the owner still could not recover damages because he was charged with knowledge of applicable laws and any expenses were incurred at the owner's own risk. *Id.* at 289, 178 N.W.2d at 217. *See also Jasaka Co. v. City of St. Paul*, 309 N.W.2d 40, 44 (Minn.1981). In this case, the trial court found that city employees did not exercise discretion in approving building permits because where proposed land uses complied with the zoning requirements, permits must be granted and where

---

3. Minn.Stat. § 466.03 provides certain exceptions:

Subdivision 1. **Scope.** Section 466.02 does not apply to any claim enumerated in this section. As to any such claim every municipality shall be liable only in accordance with the applicable statute and where there is no such statute,

every municipality shall be immune from liability.

\*  \*  \*  \*  \*  \*

Subd. 6. **Discretionary acts.** Any claim based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused.

those proposed uses did not comply, permits must be denied. The court of appeals affirmed, reasoning that our opinion in *Anderson* was not consistent with our later opinions. *Snyder*, 422 N.W.2d at 752–753. We agree with the result but not the reasoning of the decisions below.

This court has repeatedly attempted to give meaning to the term discretionary function, within the context of governmental immunity. Recently, in *Nusbaum v. County of Blue Earth*, 422 N.W.2d 713 (Minn.1988), we again said the judiciary should not, through tort actions, engage in second guessing policymaking activities that are legislative or executive in nature. *Id.* at 718; *see also Holmquist v. State*, 425 N.W.2d 230 (Minn.1988). Each case, however, must be judged in a fashion which focuses on whether the legislature intended to immunize the particular government function which has given rise to the tort action. *Nusbaum*, 422 N.W.2d at 719. To that end, we note that more than eighteen years have passed since our decision in *Anderson*, ample time for the legislature to have corrected any misapprehension this court may have entertained in *Anderson* regarding legislative intent to protect municipalities from liability in the issuance of building permits. Accordingly, we have no occasion to question the continuing viability of *Anderson*.

■ We find, however, that the facts before us present a situation not contemplated by our decision in *Anderson*. Here, the permit that issued clearly failed to satisfy the off-street parking requirement as stated in the Minneapolis Zoning Code § 540.1460. The city employees who approved the permit did not have discretion to approve permits in clear violation of the law. *See Anderson*, 287 Minn. at 289, 178 N.W.2d at 217. In such a situation, under *Anderson*, recovery would not lie because

the permit issuee would be charged with knowledge of the law regulating the granting of building permits. In this case, the plaintiff cannot reasonably be charged with knowledge of the failure of his proposed land use to meet the zoning requirements because the city's policy against using the publicly dedicated parking spaces in the ramp to satisfy the off-street parking requirement was found to be unwritten. Once the City had issued the initial building permit, only knowledge of the City's unwritten policy would have permitted plaintiff to realize that his proposed land use was not in compliance with the zoning code. The plaintiff had no knowledge of the unwritten policy, and the City had indicated such a policy did not exist by issuing the building permit after receiving information on the publicly dedicated parking spaces in the ramp. Under the facts and circumstances of this case, we hold the plaintiff cannot be charged with knowledge of the illegal nature of his proposed land use and may recover in negligence against the City. The case, thus, represents a narrow exception to the rule of discretionary immunity set out in *Anderson*.[4]

### III

Snyder argues the limit on municipal liability created by Minn.Stat. § 466.04 (1988)[5] is an affirmative defense and therefore should have been set forth affirmatively in the City's responsive pleading under Rule 8.03 Minn.R.Civ.P. He maintains the City has waived the cap on damages because it failed to plead or raise it prior to the completion of trial.

Rule 8.03 Minn.R.Civ.P. specifies numerous defenses which must be plead affirmatively. The Rule provides, however, that the list is not inclusive and therefore neither supports nor disproves plaintiff's claim. The court of appeals characterized

---

4. As we have concluded no discretion was involved in this case, we do not reach the question left unanswered in *Elwood:* whether the common law immunity for state employees also shields the employer from liability. *See Elwood v. Rice County*, 423 N.W.2d 671, 679 (Minn. 1988); cf. *Anderson*, 287 Minn. at 288, 178 N.W.2d at 217.

5. Minn.Stat. § 466.04 provides in pertinent part:
   Subdivision 1. **Limits, punitive damages.** Liability of any municipality on any claim within the scope of sections 466.01 to 466.15 shall not exceed
   (a) $200,000 when the claim is one for death by wrongful act or omission and $200,000 to any claimant in any other case;

§ 466.04 as a limitation rather than a defense, holding that the City's failure to raise the issue did not prevent application of the statute. *Snyder*, 422 N.W.2d at 753. The use of such labels, however, does not effectively analyze plaintiff's claim that Minn.Stat. § 466.04 acts as a complete defense to all damages in excess of $200,000.

The issue of whether the statutory damage cap is an affirmative defense being one of first impression, we deem it appropriate to consider the policies underlying Minnesota Rules of Civil Procedure 8.03. (Rule 8.03 Minn.R.Civ.P.) Federal Rule 8(c) is identical to Minnesota Rule 8.03. Rule 8(c) F.R.Civ.P. Commentators on the federal rules, Charles Wright and Arthur Miller, state several criteria for determining when a matter, not specified in the federal rule, should be considered an affirmative defense. The relevant factors here are surprise and fairness. The surprise factor is raised, and suggests an affirmative defense, "[h]ad the defense * * * been put forward when it could and should have been, it would have been open to plaintiff to pursue at that time such discovery procedures as he considered appropriate, in order to develop the true state of facts." C. Wright & A. Miller, Federal Practice and Procedure § 1271 (1969), quoting *Garrison v. Baltimore & Ohio R. Co.*, 20 F.R.D. 190, 195 (W.D.Pa.1957). Wright and Miller also state:

> Since an affirmative defense will defeat plaintiff's claim if it is accepted by the court, Rule 8(c), by requiring defendant to plead his defense or risk waiving it, also serves the purpose of giving the opposing party notice of the defense and an opportunity to argue why his claim should not be barred completely.

Wright & Miller § 1270 (Supp.1987).

It is unclear that affirmatively pleading the cap on damages could, in any way, affect either the evidence adduced at trial or the discovery practices of either party. Moreover, there is notice because the cap is published in Minnesota Statutes and applies to all claims. Finally, as the cap also does not bar plaintiff's action completely it would appear Wright and Miller's surprise factor does dictate the cap need not be pled as an affirmative defense.

■ The other factor considered by Wright and Miller is fairness,

> a short-hand expression reflecting the judgment that all or most of the relevant information on a particular element of a claim is within the control of one party or that one party has a unique nexus with the issue in question and therefore that party should bear the burden of affirmatively raising the matter.

Wright & Miller, § 1271. Evidence adduced at trial, or control of that evidence is unaffected by a failure to plead the cap and the plaintiff is, or ought to be, well aware of the special nexus between the municipality and the damage cap. Under the relevant criteria given by commentators Wright and Miller, the cap on municipal liability is not an affirmative defense under Rule 8.03. We therefore hold that the cap on municipal tort liability provided by Minn.Stat. § 466.04 is not an affirmative defense but a statutory rule of law that trial courts are obliged to impose whenever damages exceed the statutory limit.

## IV

■ Snyder next challenges the constitutionality of the cap on damages on equal protection and due process grounds. A statute is presumed constitutional unless it is proven otherwise beyond a reasonable doubt. *Hickman v. Group Health Plan, Inc.*, 396 N.W.2d 10, 13 (Minn.1986), citing *Minnesota Higher Education Facilities Authority v. Hawk*, 305 Minn. 97, 232 N.W.2d 106 (1975). A party who challenges a Minnesota statute as unconstitutional bears the burden of establishing beyond a reasonable doubt that the statute violates some constitutional provision. *Head v. Special School District No. 1*, 288 Minn. 496, 182 N.W.2d 887 (1970), *cert. denied*, 404 U.S. 886, 92 S.Ct. 196, 30 L.Ed. 2d 168 (1971). This court exercises the power to declare a statute unconstitutional only when absolutely necessary and then only with great caution. *Minneapolis Gas Co. v. Zimmerman*, 253 Minn. 164, 173, 91 N.W.2d 642, 650 (1958).

■ We have recently upheld the cap on state tort liability, Minn.Stat. § 3.736, subd. 4 (1986), against just such a challenge. We found the cap to be "rationally related to the legitimate government objective of insuring fiscal stability to meet and carry out the manifold responsibilities of government." *Lienhard v. State*, 431 N.W.2d 861, 868 (Minn.1988). We find the same governmental objectives present in the cap on municipal tort liability. Thus, under the reasoning of *Lienhard* we hold that Minn. Stat. § 466.04 survives equal protection and due process challenges.

We also find Snyder's challenges to the municipal damage cap as a denial of his right to a remedy under art. I § 8 of the Minnesota Constitution, the remedies clause, to be without merit. We have considered a similar remedy clause challenge to a statute and stated, "the legislature [may] constitutionally abrogate a common-law right without providing a reasonable substitute if it is pursuing a permissible, legitimate legislative objective." *Calder v. City of Crystal*, 318 N.W.2d 838, 844 (Minn.1982), citing *Tri–State Ins. Co. v. Bouma*, 306 N.W.2d 564, 566 (Minn.1981). The legislative purpose of insuring fiscal stability of the government, which is manifest in the cap on municipal tort liability, is legitimate. Accordingly, under *Calder*, we hold that Minn.Stat. § 466.04 is not a violation of art. 1 § 8 of the Minnesota Constitution.

### V

Respondent City, argues the damage award in this case was excessive because it was based on speculative rent figures. The City contends the actual figures used amounted to speculation because they were based on a rental opportunity which became available subsequent to the period for which damages are sought and that the size of the building used to calculate the damages was incorrect. The City also asserts that Snyder failed to mitigate his damages.

Ordinarily, the amount and extent of damages is a question of fact. But whether the trial court's theory of valuation of

damages is speculative or erroneous is a question of law. *Olivetti Corp. v. Ames Business Systems, Inc.*, 319 N.C. 534, 547–48, 356 S.E.2d 578, 586–87 (1987); *Freidus v. Eisenberg*, 123 A.D.2d 174, 180, 510 N.Y. S.2d 139, 144 (N.Y.App.Div.) modified on other grounds, 71 N.Y.2d 981, 524 N.E.2d 423, 529 N.Y.S.2d 69 (1987).

■ An award of damages may not be based on speculation or conjecture. *Ahrenholz v. Hennepin County*, 295 N.W.2d 645, 649 (Minn.1980). The City insists that the proper measure of damages in this case is diminution of the value of plaintiff's land and that an award based on the future lease of Johnny Rockets Restaurant is speculative and not part of the diminution value. Generally, if the damage to land is a temporary or continuing injury, the measure of damages is the diminution of the rental value of the land until the time of trial. *Kallevig v. Holmgren*, 293 Minn. 193, 199, 197 N.W.2d 714, 717 (1972): 5c Dunnell Minn.Digest 2d *Damages* § 3.02 (3 ed. 1982). Reasonable rental value of a building during the period during which it would have been complete but for the wrongful act is a reasonable measure of damages. *See Detroit Lakes Realty Co. v. McKenzie*, 204 Minn. 490, 494–95, 284 N.W. 60, 63 (1939). While we have some reservation concerning the use of a lease obtained in January or February of 1987 as an upper limit measure of the value of rents lost from November 1, 1985 through May 1, 1987, we are not prepared to say, given the facts before us, that the trial court erred in using the Johnny Rockets lease. Thus, we will not set aside the trial court's finding on the value per square foot of lost rents.

■ We find, however, that the trial court calculated the lost rents based on the wrong sized building. The trial court determined that plaintiff lost 1,656 square feet of rental space on both the first and second floors. This figure was arrived at by determining the total possible floor space contained in the proposed 36' × 46' structure, which was never built. As we explain *infra*, plaintiff had no cognizable rights, in his proposed building. *See Jasaka Co. v. City of St. Paul*, 309 N.W.2d 40,

44 (Minn.1981). Thus, the correct figure would have been the lost rentable space contained in the old building, if it had been repaired, which the uncontested testimony established as 1,100 square feet on the first floor and 1,260 square feet on the second floor. This reduction in the rentable space reduces the total award in lost rents as follows:

**1st floor**

| | |
|---|---|
| 1656 square feet | (the figure the trial court used) |
| — 1100 square feet | (the space available in original building) |
| 556 square feet | (space by which award must be reduced) |
| × $30.00 | (rental value found by trial court) |
| $16,680.00 | (reduction in rent for first floor, per year) |

**2nd floor**

| | |
|---|---|
| 1656 square feet | (figure trial court used) |
| — 1260 square feet | (space available in original building) |
| 396 square feet | (space by which award must be reduced) |
| × $18.00 | (rental value found by trial court) |
| $ 7,128 | (reduction in rent for second floor, per year) |

Snyder's rental award must be reduced by $23,808 per year. Pro rated over the 20 month period during which plaintiff lost rent, this figure becomes $39,680. The trial court award is thus reduced to $356,-346.75. The award also improperly included amounts for permanent loss of the square footage differential between the proposed building and the building actually constructed. As noted Snyder had no cognizable rights in the proposed building. Thus, he suffered no permanent loss by his inability to construct the building he wanted as opposed to the building the law permitted. Therefore, the trial court's award must be further reduced by $228,096.00, leaving $128,250.75.[6]

Further, as Snyder's loss should have been calculated based on the old building, he should be compensated for the loss of rents he would have received for the basement. The undisputed testimony established that this figure was $7,560. The total award is thus $135,810.75. This figure, we note, is well below the cap of $200,000.

The City has argued that Snyder failed to mitigate damages. "Damages are not recoverable for harm that the plaintiff should have foreseen and could have avoided by reasonable effort without undue risk, expense, or humiliation." *Soules v. Independent School Dist. No. 518*, 258 N.W.2d 103, 106–107 (Minn.1977), citing 1 Restat. Contracts § 336(1). The burden is on the party asserting failure to mitigate to prove that the other party failed to take reasonable steps in mitigation. 258 N.W.2d at 107. We cannot agree that Snyder's decision to seek a variance was somehow less reasonable than immediately seeking an injunction or a writ of mandamus. Therefore, we hold plaintiff did not fail to mitigate damages, except with regard to the back deck and staircase. *See* n. 6, *supra.*

## VI

Snyder claims that he states a cause of action based on estoppel and that as such an action is not subject to governmental immunity, he should be allowed full recovery under an estoppel theory. The word estoppel "means simply that someone is 'stopped' from claiming or saying something; usually he is stopped from saying the true facts or claiming a lawful claim * * *." Dobbs, Law of Remedies § 2.3, p. 41. (West 1973). "Furthermore, estoppel

---

**6.** Plaintiff's new building does not have back stairs and deck found on the old building. Nothing in the record shows that plaintiff ap- plied for a variance to build such a staircase. We, therefore, hold plaintiff failed to mitigate damages for loss of the staircase and deck.

is, according to the usual statement, a shield, not a sword. *It does not furnish a basis for damages claims,* but a defense against the claim of the stopped party." *Id.,* at 42. (Emphasis added.) The cases cited by Snyder for his claim that estoppel is a theory of recovery do not support such a proposition.

In *State, City of Eden Prairie v. Liepke,* 403 N.W.2d 252 (Minn.App.1987) the court of appeals held the government may be estopped when bringing criminal charges for a zoning violation. *Id.* at 256. The government had been told several times of the intended use of the property in issue and had issued a building permit with that knowledge. The government then prosecuted the defendant for the very land use of which it had been told and of which it had approved. In *Liepke,* estoppel was not used as a theory of recovery or as a device to circumvent statutory discretionary immunity contained in Minn.Stat. § 466.03.

In *Mesaba Aviation v. County of Itasca,* 258 N.W.2d 877 (Minn.1977) this court held the county might have been estopped from collecting taxes when it gave erroneous tax advice on which the taxpayer relied when entering into a leasehold with the county. Again estoppel was not used as a theory of recovery. *Reiser v. Commissioner of Revenue,* 369 N.W.2d 2 (Minn.1985) also presents a taxpayer attempting to estop the government in its effort to collect taxes. Again estoppel was not used as a theory of recovery. Plaintiff fails to cite a case where estoppel has been used in the novel manner he proposes here. We hold plaintiff's estoppel claim does not entitle him to money damages.

## VII

Snyder finally claims his constitutional rights were twice violated by city actions and that both of these alleged violations are compensable under 42 U.S.C. § 1983. To succeed plaintiff must show a person acting under color of state law deprived him of a protected property interest in violation of his constitutional rights. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981). Additionally, as there is no respondeat superior liability under § 1983, plaintiff must prove the unconstitutional deprivation was caused by an official unconstitutional policy of the municipality. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 479–82, 106 S.Ct. 1292, 1299–1300, 89 L.Ed.2d 452 (1986). We analyze plaintiff's § 1983 claims individually.

First, Snyder claims upon receiving a building permit he also acquired a protected property interest, which could not be constitutionally denied without due process, namely a pre-deprivation hearing. Snyder did not receive a pre-deprivation hearing regarding . the revocation of his building permit. He asserts that had he received such a hearing, if conducted fairly, it would have resulted in prompt reinstatement of the permit. The trial court found the City had had past experience with building permit revocations yet had no procedures in place to provide a pre-revocation hearing.

In *Littlefield v. City of Afton,* 785 F.2d 596, 600 (8th Cir.1986) the eighth circuit court of appeals set out the analytical framework of a § 1983 procedural due process claim. "[A] court must first consider if the plaintiff has a constitutionally protected property interest." *Id.* Absent such a protected interest, no § 1983 claim is stated. The city's argument is almost exclusively based on the non-existence of a protected property interest in the erroneously issued building permit at issue.

"Property interests are created and their dimension defined by existing rules or understandings that stem from an independent source, such as state law, rules or understandings that support claims of entitlement to certain benefits." *Littlefield,* 785 F.2d at 600, citing *Parratt,* 451 U.S. at 529, 101 S.Ct. at 1910. The *Littlefield* court reasoned that as Minnesota laws left no discretion in municipalities to deny a proposed land use, which conformed to applicable laws and codes, "an applicant for a building permit has a constitutionally protected property interest in the permit, which is conditioned only by compliance with the ordinances." *Id.* at 602. Snyder's proposed land use, however, conflicts with

§ 540.1460 and § 528.50 of the Minneapolis Zoning Code which requires the owner to provide off street parking.[7] Since plaintiff's land use does not conform to local law, we turn to an examination of state law to determine what rights, if any, plaintiff acquired in an erroneously issued building permit.

■ This court has said "where a permit has been issued by an authorized officer under a mistake of fact and contrary to zoning ordinances, it confers no privilege on the person to whom it is issued * * *." *State ex rel. Howard v. Village of Roseville*, 244 Minn. 343, 350, 70 N.W.2d 404, 408 (1955). *Accord: Jasaka Co. v. City of St. Paul*, 309 N.W.2d 40, 44 (Minn.1981). Subsequently, this court said even when the owner of property has begun and made substantial progress in construction of a building, in reliance on a mistakenly issued building permit, the permit confers no vested property right. *Jasaka*, 309 N.W.2d at 44. The tenth circuit court of appeals relying on similarly worded state court decisions held that a building permit issued by mistake or in violation of the law created no property right in the issuee. *Gunkel v. City of Emporia, Kansas*, 835 F.2d 1302, 1304 & n. 7 (10th Cir.1987). "Thus, revocation of the permit without notice or hearing does not amount to a harm for which section 1983 provides a remedy." *Id.* at 1305. We hold Snyder suffered no deprivation of a protected property interest and has no claim under § 1983 for the City's failure to provide a hearing before his building permit was revoked.

Snyder's other § 1983 claim is based on the denial of his variance applications before the Board of Adjustment and the City Council. He claims that the denial of his variance applications was arbitrary, capricious, and politically motivated. Snyder argues the failure to grant him a "fair" hearing violates his constitutional substantive due process rights and is compensable under § 1983.

It is unclear if a cause of action for a substantive due process violation of plaintiff's right to a fair variance hearing exists under § 1983 and if plaintiff has proved damages. Plaintiff relies on *Littlefield* which held that a substantive due process claim was stated when a municipality acted arbitrarily and capriciously in denying a conforming land use proposal a building permit. *Littlefield*, 785 F.2d at 607. Subsequently, in *Lemke v. Cass County Nebraska*, 846 F.2d 469, 470–71 (8th Cir.1987), the eighth circuit, sitting en banc, reconsidered *Littlefield* and the substantive due process question and said it was an open question in this circuit. Five of the nine judges in *Lemke*, concurring, said, *Littlefield* was without precedential value on this point. *Id.* at 473. Other circuits, however, recognize such a cause of action. *Littlefield*, 785 F.2d at 604–607.

■ Even if we were to recognize that such a cause of action exists, which we do not, there are problems with proof of damages. When procedural due process violations occur, including total denial of constitutionally-required, predeprivation hearings, damages are not presumed, rather claimants must prove the procedural denial caused damages. *Carey v. Piphus*, 435 U.S. 247, 259–64, 98 S.Ct. 1042, 1050–52, 55 L.Ed.2d 252 (1978). Under § 1983, the violation of a claimant's absolute right to a procedure by itself, gives rise only to nominal damages, not to exceed one dollar. *Id.* at 266–67, 98 S.Ct. at 1054. It is difficult to comprehend why the alleged "unfair hearing" in the instant case should be treated differently than the complete denial of a hearing as in *Carey*. Thus, a plaintiff must prove the "unfair hearings" he received caused his damages. This proof must include proof that if plaintiff had been granted the proper procedure, i.e., a fair hearing, the result would have been different and a variance would have issued. *See id.* at 260, 98 S.Ct. at 1050; *see also Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 285–87, 97 S.Ct. 568, 575–76, 50 L.Ed.2d 471 (1977). The trial court did

---

**7.** § 528.50 requires the offstreet parking be in the possession of the owner of the zoning lot in question. Possession may be either by deed or long term lease. Plaintiff did not argue that he had a lease for the parking in the Calhoun Square Ramp.

not make such a finding and plaintiff offered no evidence to support such a finding. Plaintiff's substantive due process § 1983 claim was properly denied.

We affirm the holding of the court of appeals with modifications in the damage award and remand for proceedings consistent with this opinion.

Affirmed as modified and remanded.

KEITH, J., took no part in the consideration or decision of this case.

## APPENDIX A
The trial court calculated damages as follows: